IN THE DISTRICT COURT OF THE UNITED STATES
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| ) | CRIMINAL NO.: 2:23-761-DCN |
| vs. ) | |
| ) | |
| **CAMERON BANKS** ) | |
|    a/k/a "Reggie Staggers" ) | |
|    a/k/a "Roy Hamilton" ) | |
| ) | |

**Government's Motion for Upward Variance**

The Defendant, Cameron Banks, plead guilty on May 22, 2025 to Obstruction of Justice, in violation of 18 U.S.C. §§ 1503 and 2 (Count 1); Witness Tampering, in violation of 18 U.S.C. §§ 1512(b)(1) and 2 (Count 4); and Falsification of Records in a Federal Investigation, in violation of 18 U.S.C. § 1519 and 2. Banks is scheduled to be sentenced by this Court on October 1, 2025. The Presentence Report outlines an applicable guideline range of 92 to 115 months, based on a total offense level 24 and a criminal history category V.

On September 30, 2025, Banks submitted a sentencing memorandum to the Court arguing, in part, that United States Sentencing Guideline § 5G1.3 applies to the conduct outlined in the Presentence Report, requiring the Court to impose a sentence concurrent to his present sentence.[1] As fully set forth below, a guideline sentence, imposed concurrent to Banks' present term of incarceration, does not serve the purposes of sentencing outlined in 18 U.S.C. § 3553(a). The Government therefore requests an upward variance to 200 to 223 months, representing his current

---

[1] The United States Probation Office outlined the applicability of U.S.S.G. § 5G1.3 in paragraph 172 of the PSR. However, the Government did not understand or appreciate the applicability and impact of § 5G1.3 until Banks' counsel filed his sentencing memorandum on September 30, necessitating the present motion.

1

108-month term of imprisonment plus the guideline range in the PSR.[2]

## I. Factual History

On July 25, 2017, Banks was charged in an Indictment with seven counts of health care fraud, in violation of Title 18 U.S.C. § 1347. Numerous superseding indictments followed, and on March 12, 2019, Banks was charged in a Third Superseding Indictment, 2:17-699, with 23 counts, including conspiracy to commit health care fraud, mail fraud, and bank fraud, as well as substantive counts of health care fraud, bank fraud, wire fraud, money laundering, engaging in monetary transactions in property derived from specified unlawful activity, aggravated identity theft, obstruction of a health care fraud investigation, and falsification of documents. On June 11, 2019, Banks was charged in a separate 15-count Indictment, 2:19-544, charging a mail and wire fraud scheme in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343 and money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i).

These cases derived from multiple investigations into fraudulent schemes in which Banks submitted false documents to obtain vehicles, money via healthcare loans, South Carolina Department of Transportation ("SCDOT") numbers, and investor funds. PSR ¶ 17. To effectuate his fraudulent schemes, Banks used other peoples' identifications and false information to obtain money and attempted to obstruct and hide his criminal activity through other schemes. *Id.* While these fraudulent schemes were very complex and required years of investigation, a brief summary of each scheme underlying the indictments and the obstruction conduct committed to cover-up those schemes is set forth below.

---

[2]     Banks faces a maximum possible penalty of twenty years on Counts 4 and 8.

A.  Health Care Fraud Scheme

The first scheme began in 2013 when Banks was hired by a dentist named Dr. Cornelius Beck ("Dr. Beck") to assist him in improving his credit. Banks claimed to be a pastor with a finance degree from Newberry College. PSR ¶ 18. Banks soon acquired a 2014 Bentley sedan for $212,034.00 by submitting a falsified loan application with Dr. Beck serving as a co-signor when he was actually unaware of the loan, as well as other false information.[3] *Id.* at ¶ 19. Thereafter, while employed by Dr. Beck, Banks ran a loan program under which he submitted loan applications on behalf of patients to obtain dental work. *Id.* Banks prepared and submitted fraudulent loan applications on behalf of the patients to obtain funds that were intended to be used for dental procedures. *Id.* However, few people received any dental work, and the funds were transferred into Banks' personal bank accounts and converted for his own use. *Id.*

To obtain these loan funds, Banks created fraudulent documents and cut and pasted Dr. Beck's signature from patient files onto these fraudulent documents. *Id.* at ¶¶ 19-23. Banks worked with others who conspired with Banks to submit the falsified loan applications. *Id.* at ¶¶ 19-43. Some of the coconspirators received dental work valued at much less than the loan amount, while some coconspirators never received any dental work but received funds from the loans, along with Banks. *Id.* Once the loan amounts were processed and deposited through the dental office's bank accounts, the majority of the proceeds were diverted into Banks' personal bank accounts through a series of electronic transfers, allowing Banks to convert the proceeds for his own use. *Id.* Banks' involvement in the health care fraud scheme led to the charges set forth in Counts 1 through 17 of the first indictment, 2:17-699.

---

[3]   Banks was charged with wire fraud in Count 18 of the first indictment, 2:17-699, for submitting the false loan application for the Bentley.

      i.      Banks' Attempt to Cover Up Involvement the Loan Scheme

Banks' schemes continued. In February 2015, Banks falsified W-2s and other loan documents to obtain an Escalade.[4] *Id.* at ¶ 43. In March 2015, Banks a man to conspire with him to frame Dr. Beck with an alleged attempt to kill Banks. *Id.* at 44. The man told investigators that Banks provided him a script of what to say to lawyers and investigators. *Id.* Banks told the man to wait at a gas station close to Dr. Beck's home so that he could be seen interacting with Dr. Beck. *Id.* The man then claimed that Dr. Beck paid him $15,000 to kill Banks. *Id.* During a proffer interview in 2019, the man admitted his role in the scheme and that Banks intended to shift blame to Dr. Beck for the dental loan scheme set forth above. *Id.*

In July 2016, a fire broke out at a church owned by Banks. *Id.* at 45. After the fire was extinguished, investigators searched the church and located dental records from Dr. Beck's practice along with some of Dr. Beck's personal effects. *Id.* Investigators thereafter obtained a search warrant for Banks' home, during which they seized and searched his laptop. *Id.* Agents discovered that Banks had researched arson investigations and an application that would generate fake text message conversations. *Id.* Investigators later learned that Banks purchased the church in 2012 for $328,400 but had never held church services. *Id.* at ¶ 46. The seller remained the lienholder on the property, and after Banks stopped paying the mortgage, the seller began foreclosure proceedings in July 2016.

Banks had taken out an insurance policy on the church for approximately $1.5 million, more than four times the amount he paid for the church. *Id.* at ¶ 52. Ten days before the fire, Banks told one of his coconspirators to report that she had witnessed several homeless people in the

---

[4]    Banks was charged with wire fraud in Count 19 of the first indictment, 2:17-699, for the false loan application for the Escalade.

church. During the reported call, she mentioned the insurance and the need to document that the homeless people were in the church in case there was a fire. *Id.* at ¶ 47. The investigation revealed Banks' attempt to frame Dr. Beck for the arson and to coverup his role in the fire. *Id.* at 47-53. Banks hired coconspirators to assist in the coverup. *Id.* He created fake text conversations and documents, all discovered during searches of his car, home, and computers.[5] *Id.*

### B. SCDOT and Commercial Trucking Ponzi Scheme[6]

Between 2015 and 2018, Banks submitted numerous requests to the SCDOT to obtain numbers to operate commercial vehicles. These requests contained false information and withheld information Banks was required to disclose. After being indicted for these new charges in a superseding federal indictment, 2:17-699 ECF No. 348 (Counts 20-23), and while on pretrial supervision for the charges related to the dental loan fraud scheme outlined above, Banks began a new scheme. In this new scheme, Banks defrauded investors by operating a Ponzi scheme in which investors believed they were investing in the operation of a trucking business. The investors leased trucks from Banks and were told that they would receive a portion of the profits made from the trucks' operation. Banks and his trucking company would provide the truck, the driver, and the insurance, and in exchange, the investors would lease the truck for one year and receive a majority of the profits.

Not long after their investments, investors began receiving far less than the amount promised under their leasing contracts. Banks created false expense documents to send to the investors to explain the lack of profits and claimed that the funds were used to make truck

---

[5]     Although the arson of the church is one way in which Banks attempted to obstruct the investigation and prosecution of the charges against him, this obstruction is not the subject of the underlying charges for which he is scheduled to be sentenced on October 1, 2025.

[6]     This conduct is summarized in PSR paragraphs 53 to 77.

payments and buy insurance. He mailed these fraudulent expense documents to the investors. In response to these fraudulent expense forms, some investors mailed checks to Banks to pay for these "expenses." In reality, Banks spent the investment funds on personal expenses, such as car leases, jewelry, and travel. To keep the scheme going, Banks mailed investors checks that represented a portion of the funds to which they were entitled under the contracts. Ultimately, Banks was indicted on a separate federal indictment for this conduct, 2:19-544.

C. Obstruction Conduct[7]

After Banks was indicted for his conduct in all of the fraudulent schemes outlined above, Banks' attorneys filed two witness affidavits alleging that the case agents who investigated the cases and Dr. Beck were trying to frame Banks and that one of the case agents had threatened witnesses. The affidavits were attached to Ex Parte Motions to defer production of the identities of these witnesses and the exhibits supporting Banks' allegations against Dr. Beck and the agents. The Court granted the Ex Parte Motions, so the government was not able to investigate the allegations or learn the substance of those claims.[8]

On August 26, 2019, Banks entered a guilty plea to Count 23 of the Third Superseding Indictment in 2:17-699 and Count 1 of the Indictment in 2:19-544 pursuant to the terms of an 11(c)(1)(C) plea agreement contemplating a sentencing range of 5-9 years. Specifically, Banks plead guilty to falsification of a document in relation to the scheme to obtain SCDOT numbers, in violation of 18 U.S.C. § 1519, and mail fraud in relation to the trucking Ponzi scheme, in violation of 18 U.S.C. § 1341.

---

[7]  This conduct is summarized in PSR paragraphs 78 through 87.
[8]  The first Ex Parte Motion was filed on January 4, 2019 and relates to allegations made by a woman named Alexandra Reyna-Arcos ("Witness A" or "Reyna-Arcos"). *See* 2:17-699, Dkt. 266. The second Ex Parte Motion was filed on July 8, 2019 and relates to allegations made by another woman named Seayanna Parham ("Witness B" or "Parham"). *See* 2:17-699, Dkt. 422.

After Banks' guilty plea, the government filed a motion to unseal the Ex Parte Motions on July 31, 2020, which the Court granted without objection from the defense. ECF Nos. 459 and 460. Thereafter, the government began investigating the allegations contained within those motions and exhibits, including affidavits submitted by "Witness A" and "Witness B".

i. Witness A

In Witness A's affidavit, later determined to be Alexandra Reyna-Arcos,[9] she claimed that she worked for Dr. Beck and kept a diary during the course of her employment. She provided Banks alibis for all of the allegations in the first indictment, 2:17-699, and claimed that, while she was employed at the dental office, she discovered that Dr. Beck was committing the loan fraud scheme outlined above. She also claimed that she witnessed Dr. Beck speaking with case agents about framing Banks. To support her claims, Witness A provided photos of discovery documents, the case agent's business card, an envelope full of cash, and a pack of cigarettes that she claimed were on the table during Dr. Beck and the case agent's meeting. Witness A claimed that she provided her journal to the case agent, but that he burned the journal. Before burning the journal, she claimed to have scanned and stored the journal entries on a flash drive. She then alleged that the case agent threated to deport her family members and stated that "lots of Hispanics disappear and no one cares."

On December 10, 2019, the FBI interviewed Witness A with her attorney present. The agents presented her with evidence that contradicted the claims contained in her affidavit.

---

[9] On June 29, 2020, the government filed an Information charging Reyna-Arcos with conspiracy to commit obstruction in violation of 18 U.S.C. §§ 1503 and 371 and making a false statement to the FBI in violation of 18 U.S.C. § 1001. 2:20-369, ECF No. 1. The government filed an executed plea agreement that same day in which Reyna-Arcos has agreed to plead guilty to conspiring to obstruct an investigation and making a false statement to the FBI. *Id.* at ECF No. 2. Reyna-Arcos has not yet entered a guilty plea.

Thereafter, she fully recanted the allegations contained in the affidavit. She admitted to having a romantic relationship with Banks. Banks provided her a home and paid her between $1,200 and $1,500 per month. At Banks' direction, Witness A copied documents in her handwriting, including journal entries and letters, and created fictitious recordings from scripts Banks provided. She provided detailed information about how Banks directed her to obstruct the investigation, and she completely recanted the allegations contained in the affidavits submitted to the Court in support of the Ex Parte Motions.

Witness A met with Banks' lawyers and their paralegal on numerous occasions to provide documents Banks had given her. Witness A did not recall signing the November 15, 2018 affidavit, filed with the Court as an exhibit, but she did recall going over the documents with Banks' attorney and their paralegal in great detail. On multiple occasions, Banks' attorney contacted Witness A directly and requested that she sign a revised affidavit. Witness A expressed that she did not want to sign the revised affidavit and never signed the final version. Banks' lawyers filed the first version of the affidavit, claiming that Witness A signed that version in November, after Witness A expressed that she did not want to sign the revised affidavit and no longer wanted to participate.

  ii. <u>Witness B</u>

In the second affidavit, Witness B, later determined to be Seayanna Parham,[10] claimed that she worked for Banks as a nanny in his home and for his trucking company. She claimed that while she was in Banks' home, she witnessed an FBI case agent and a female enter the Banks' residence

---

[10] On June 23, 2020, the government filed an Information charging Parham with conspiracy to commit obstruction in violation of Title 18 U.S.C. §§ 371 and 1503. 2:20-360, ECF No. 1. That same day, the government filed a plea agreement in which Parham agreed to plead guilty and cooperate with the government. *Id.* at ECF No. 2. On August 19, 2020, Parham plead guilty and admitted to conspiring to obstruct justice by tampering with witnesses and submitting false documents and statements to Banks' attorneys knowing that those documents would be submitted to the Court and the government. *Id.* at ECF No. 23, Tr. 19:17-22:17.

without a warrant to place recording devices in the home and witnessed them entering the home on numerous occasions. Witness B also stated that the FBI agent threatened her life and requested the keys to Banks' Cadillac so that they could access the church. She claimed to have recorded a conversation with another victim of Banks' fraud in which the victim admitted to conspiring with the case agents and Dr. Beck to frame Banks for wire fraud.

In January 2020, Witness B was interviewed by investigators with her attorney present and recanted the allegations contained within her affidavit. She admitted to having a romantic relationship with Banks and to Banks paying her cash and buying her clothes during their relationship. Witness B got pregnant with Banks' child. Banks convinced Witness B to assist him with his criminal charges, claiming that he was being framed. He gave her a handwritten script and told her to read it into a recording. Banks then used an old phone call with Robinson and edited it to add Witness B's recording to make it sound like a recorded call between Robinson and Witness B. Banks told Witness B that one of his lawyers was helping him mesh the recordings of her voice with others to make the final recording. Banks then prepped her for meetings with agents and attorneys and provided the case agent's business card and a set of keys to his Cadillac to give to his attorneys.

Thereafter, Witness B met with Banks' attorneys on two separate occasions. She gave them the business card and Cadillac keys, then verified the recording they received from Banks. During the second meeting, the attorneys drafted an affidavit based on the information they received from Witness B and the recording during the first meeting. Witness B signed the affidavit that was later attached as an exhibit to the Ex Parte Motions.

## II.   Procedural History

As set forth above, on August 26, 2019, Banks entered a guilty plea to Count 23 of the Third Superseding Indictment in 2:17-699 and Count 1 of the Indictment in 2:19-544 pursuant to the terms of an 11(c)(1)(C) plea agreement contemplating a sentencing range of 5-9 years. Specifically, Banks plead guilty to falsification of a document in relation to the scheme to obtain SCDOT numbers, in violation of 18 U.S.C. § 1519, and mail fraud in relation to the trucking Ponzi scheme, in violation of 18 U.S.C. § 1341.

The Government continued its obstruction investigation while awaiting Banks' sentencing on the related charges. The USPO prepared a presentence report ("PSR"), outlining a total offense level 42 and criminal history category VI, resulting in an advisory sentencing range of 360 months to Life. Dkt. 2:19-544, 2:17-699, PSR ¶¶ 201. However, the plea agreement contained an 11(c)(1)(C) sentencing range of 60 to 108 months. *Id.* at 202. Notably, Banks objected to the obstruction enhancement in the PSR, based in part on the conduct underlying the current charges. The Government recommended that the Court not consider the obstruction conduct in imposing a sentence, hoping to preserve the integrity of the obstruction investigation with the intent to pursue separate charges. *See* Sentencing Tr. 9:19-10:7. On May 25, 2021, the Court sentenced Banks to 108 months imprisonment, the top of the stipulated 11(c)(1)(C) range.

On September 19, 2023, a federal grand jury returned an eight-count Indictment, charging Banks with two counts of Obstruction of Justice in violation of 18 U.S.C. §§ 1503 and 2; four counts of Witness Tampering in violation of 18 U.S.C. §§ 1512(c) and 2; and two counts of Falsification of Records in a Federal Investigation in violation of 18 U.S.C. §§ 1519 and 2.

Banks plead guilty to one count of Obstruction of Justice, One Count of Witness Tampering, and One Count of Falsification of Records. The USPO prepared an extensive

presentence report, calculating a total offense level 24 and a criminal history category V, resulting in an advisory guideline range of 92 to 115 months, *to be served concurrent to the sentence Banks is currently serving*. PSR ¶¶ 170-172. For the reasons set forth below, a concurrent sentence does not serve the purposes of sentencing outlined in 18 U.S.C. 3553(a). Therefore, the government requests an upward variance.

### III.     Argument

A concurrent sentence within the guideline range would constitute a ceremonial slap on the wrist. Such a sentence would only serve to condone deception, dismiss the impact of his obstruction on the victims, the government, the Court, and the administration of justice, and incentivize similar conduct by others. The sentencing factors demand a sentence above the advisory guideline range.

#### A. Applicable Law

The United States Sentencing Guidelines are advisory, *United States v. Booker*, 543 U.S. 220 (2005), but district courts are required to use the Guidelines' advisory range as "the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). Courts must also consider the relevant sentencing factors in 18 U.S.C. § 3553(a). *United States v. Green*, 436 F.3d 449, 456 (4th Cir. 2006). Relevant here, the Court shall consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed--
> > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> > (B) to afford adequate deterrence to criminal conduct;
> > (C) to protect the public from further crimes of the defendant; and
> > (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; [and]
> 
> ....

>   (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

18 U.S.C. § 3553(a).

When a "court decides that a sentence outside the Guidelines' advisory range is appropriate, it must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *United States v. Zuk*, 874 F.3d 398, 409 (4th Cir. 2017) (cleaned up). A major departure from the advisory range "should be supported by a more significant justification than a minor one." *United States v. Morace*, 594 F.3d 340, 346 (4th Cir. 2010) (internal quotations omitted). After choosing a sentence it deems appropriate, the court "must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing." *Id.* Appellate courts reviewing a sentence that is outside the advisory range "may consider the extent of the deviation, but must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance," and the fact that the appellate court "might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court." *Id.*

>   B. <u>Sentencing Factors</u>
>
>>   a. **An upward variance is necessary after weighing the nature and circumstances of the offense and the need to reflect seriousness of the offense.**

This Court is intimately familiar with the nature and circumstances of Banks' conduct, having presided over his previous two federal indictments and granted Banks' ex parte requests that serve the basis of his obstruction, witness tampering, and falsification of records charges. While under federal indictment, Banks exploited and leveraged his relationships with two individuals to corruptly influence, impede, and obstruct the administration of justice. He created and directed the creation of fake letters, journal entries, and recordings, and then orchestrated their

submission to this Court—all to thwart the prosecution against him. Banks' obstruction conduct was sophisticated, calculated, and deliberate. He lodged patently false allegations against career federal agents and innocent victims, slandering their characters and subjecting them to severe emotional and physical distress. The nature and circumstances of these offenses are among the most severe. Banks' obstruction conduct serves as a threat to the judicial system, to the due administration of justice, and to the public's trust in the Rule of Law. His conduct must be punished accordingly.

      **b. The Defendant's history and characteristics warrant an upward variance, as does the need to afford adequate deterrence and protect the public from future crimes of the Defendant.**

The Defendant's extensive criminal history demonstrates that he is largely unwilling and unable to be deterred or rehabilitated. PSR ¶¶. His criminal conduct first began when he was 18 years old, and his criminal history is riddled with arrests and convictions for forgeries, frauds, scams, and schemes ranging in complexity and sophistication and spanning his entire adult life. *Id.* Banks also has a conviction for a violent offense, including Assault and Battery of a High and Aggravated Nature, PSR ¶ 100. He has engaged in intricate schemes of deceit, fraud, money laundering, and identity theft. And while he was on bond after his first federal indictment, he began a separate scheme in which he defrauded vulnerable investors. He used his ill-gotten gains for his own personal enrichment. Notably, Banks did not receive any criminal history points for his convictions on the related cases in 2:19-544 and 2:17-699. PSR ¶ 109-130.

Banks' criminal history and characteristics warrant a sentence above a concurrent sentence within the guideline range.

### c. An upward variance is necessary to provide just punishment and promote respect for the law.

In May 2021, at the time of Banks' sentencing on the relevant conduct, the government's obstruction investigation was ongoing. The government was not yet fully aware of the extent of Banks' obstruction, the potential involvement and culpability of others, or the full evidence that established Banks' guilt. A federal grand jury did not return an indictment on the obstruction conduct until September 2023, more than two years after Banks' sentencing. Therefore, Banks could not have been held fully responsible for the obstruction conduct at that time. And he should not now be shielded by an advisory sentencing guideline that undermines the purposes of sentencing.

Moreover, Banks leveraged his obstruction to obtain a favorable 11(c)(1)(C) plea from the government while the government was essentially blind folded and had its hands tied behind its back. In the month preceding Banks' guilty plea—but after Banks' lawyers filed the *ex parte* documents with the Court—Banks' lawyers met with the government to discuss a potential plea. During the meetings, Banks' attorneys lodged allegations against case agents and the government, undermined the strength of the case, and warned that their defenses would bring embarrassment and harm to the government. During these negotiations, Banks' lawyers would not allow government to view the documentation they claimed supported the allegations. These allegations were based entirely on the now discredited claims that underly the obstruction, witness tampering, and falsification of records charges.

Following this meeting and after hearing about the allegations against the government and the investigators—but before the government had an opportunity to investigate these claims, the government agreed to an 11(c)(1)(C) sentencing range of 5-9 years. On August 26, 2019, Banks entered a guilty plea to Count 23 of the Third Superseding Indictment in 2:17-699 and Count 1 of

14

the Indictment in 2:19-544 pursuant to the terms of an 11(c)(1)(C) plea agreement contemplating a sentencing range of 6-9 years. After Banks' guilty plea, the government filed a motion to unseal the Ex Parte Motions, which the Court granted without defense objection. Thereafter, the government began investigating the allegations contained within those motions and exhibits, as set forth above.

In sum, Banks submitted the false information in court filings and leveraged the false information to obtain a more favorable sentencing range—one he never would have obtained absent the threats of harm and embarrassment. Without the benefit of the 11(c)(1)(C) sentencing range, Banks faced an advisory sentencing range of 360 months to Life. The extraordinary variance from that guideline range—although agreed upon by the government—was induced by fraud and deceit. Banks should not now get the second windfall of a concurrent sentence within the advisory guideline range. An upward variance is necessary to promote respect for the law and provide just punishment.

                                              BRYAN P. STIRLING
                                              ACTING UNITED STATES ATTORNEY

By:   *s/ Emily Evans Limehouse*
        Emily Evans Limehouse
        Assistant United States Attorney
        Federal I.D. No. 12300
        Charleston, South Carolina
        Emily.Limehouse@usdoj.gov

September 30, 2025